# **Exhibit 1**

**(APA)**

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of May 25, 2023 (the "Effective Date"), by and among JCR Holdings II, LLC, a Delaware limited liability company ("Purchaser"), Encina Private Credit SPV, LLC, a Delaware limited liability company ("First Out Lender"), and Don A. Beskrone, solely in his capacity as Chapter 7 Trustee of Debtor ("Trustee" or "Seller"), in connection with the following:

A.    On May 5, 2023 (the "Petition Date"), JC USA, Inc., JC Franchising, Inc., Craig Holdings, Inc., Jenny C Acquisition, Inc., Jenny C Intermediate Holdings, Inc. and Jenny C Holdings, LLC (collectively, "Debtor") each filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

B.    The Trustee has been appointed to serve as chapter 7 trustee for Debtor in their bankruptcy cases (Case No. 23-10585 (JKS)) (Jointly Administered) (the "Bankruptcy Case");

C.    Prior to the Petition Date, Debtor was engaged, directly or indirectly, in the business of manufacturing, development, commercialization, marketing, distribution and sale of products, programs and services for weight management or enhancing weight loss (the "Business"); and

D.    First Out Lender constitutes the "Required First Out Lenders" under that certain Agreement Among Lenders, dated as of April 3, 2019 (as amended, the "Agreement Among Lenders"), by and among the Last Out Lenders, the First Out Lenders, First Out Lender Representative, the Last Out Lender Representative and the Agent (each such capitalized term, as defined in the Agreement Among Lenders), that provides, among other things, that the Agreement Among Lenders is "without prejudice to the right of any First Out Lender to 'credit bid' the First Out Obligations" (as defined in the Agreement Among Lenders) owed to it pursuant to Section 363(k) and 365 of the Bankruptcy Code.

E.    Subject to the terms and conditions set forth herein, Purchaser has agreed to purchase, and Seller has agreed to sell, free and clear of all Liens, the Purchased Assets in accordance with section 363 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

ARTICLE I

## DEFINITIONS

1.1    Certain Definitions.  For purposes of this Agreement, the following terms, when used herein with initial capital letters, have the meanings specified in this Section:

"Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

"Ancillary Agreements" means the Bill of Sale, Intellectual Property Assignments, Assignment and Assumption Agreement (to the extent Purchaser elects to assume any Assumed Contracts) and any other agreements necessary to transfer the Purchased Assets to Purchaser.

"Assignment and Assumption Agreement" means the assignment and assumption agreement in form and substance reasonably satisfactory to Purchaser and Seller and duly executed by Seller, effecting the assignment to and assumption by Purchaser of the Assumed Contracts (if any).

"Assumed Contracts" means any Contracts to which Debtor is a party that are related to the categories set forth on Schedule 1.01 that Purchaser elects (in its sole and absolute discretion) to assume pursuant to Schedule 1.01.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended, and all rules promulgated thereunder constituting title 11 of the United States Code.

"Bill of Sale" means the bill of sale and conveyance in form and substance reasonably satisfactory to Purchaser and Seller and duly executed by Seller, transferring the Purchased Assets to Purchaser.

"Business Day" means any day of the year on which banking institutions in Delaware are open to the public for conducting business.

"Code" means the Internal Revenue Code of 1986.

"Contract" means any contract, agreement, commitment, promise or undertaking (including any indenture, note, bond or other evidence of indebtedness, lease, instrument, license, lease, purchase order or other legally binding agreement) whether written or oral, but excluding all Permits.

"Cure Costs" means amounts that must be paid and obligations that otherwise must be satisfied under sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assignment and/or assumption of any Assumed Contract, as determined by the Bankruptcy Court.

"Employees" means all current and former employees of Debtor.

"Excluded Contracts" means the rights and interests of Debtor and its Affiliates in, or pursuant to, any Contracts and other arrangements that are not Assumed Contracts.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, authority, department, commission, board, bureau, official or instrumentality of such body, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), whether foreign,

2

federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator thereof (public or private) of competent jurisdiction.

"Intellectual Property Assignments" means the intellectual property assignments in form and substance reasonably satisfactory to Purchaser and Seller and duly executed by Seller, transferring the purchased intellectual property listed on Schedule 1.01 to Purchaser, which for the avoidance of doubt, may need to be in original form, notarized and otherwise in form and substance suitable for recording in the applicable jurisdiction, and for domain names may require electronic transfer in accordance with the applicable domain name registrar's requirements.

"Law" means any law, statute, regulation, rule, code, decree, constitution, ordinance, treaty, rule of common law, decree, directive, criteria, guideline or policy, administered or enforced by or on behalf of, any Governmental Body, including any Order.

"Legal Proceeding" means any claim, demand, litigation, action, cause of action, suit, audit, dispute, review, hearing, charge, indictment, complaint or other judicial or administrative proceeding, at law or in equity, before or by any Governmental Body or arbitration or other similar dispute resolution proceeding.

"Liability" means any debt, loss, liability, claim (including "claim" as defined in the Bankruptcy Code), commitment, undertaking, damage, expense, fine, penalty, cost, royalty, deficiency or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, direct or indirect, matured or unmatured, determined or undeterminable, on or off balance sheet, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims.

"Lien" as applied to any Person means, with respect to any property or asset, any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, security interest, claim, encumbrance, restriction, encroachment or other survey defect, charge, option, pledge, easement, purchase right, preference, priority, option, right of first refusal, conditional sale agreement or other similar restriction (including restriction on transfer), or any other interest in property, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown, whether imposed by Law, Contract or otherwise.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Permits" means licenses, permits, approvals, certificates, authorizations, operating permits, easements, registrations, qualifications, franchises, grants, concessions, exceptions, rulings, waivers, variances or other forms of permission, consents, exemptions, plans and the like, of any Governmental Body.

3

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Representative" means, with respect to any Person, any and all directors, officers, partners, managers, employees, consultants, financial advisors, counsel, accountants and other agents, including potential financing sources of such Person.

"Sale Hearing" means the hearing before the Bankruptcy Court held pursuant to a duly noticed sale motion to determine the highest or best bid for the Purchased Assets.

"Sale Order" means an order entered by the Bankruptcy Court:  (i) that was on appropriate notice to all parties entitled to notice of any motion relating to the Purchased Assets, this Agreement or the transactions contemplated hereby; (ii) that is not subject to a stay pending appeal; (iii) that is in a form reasonably acceptable to Purchaser and Seller; and (iv), that provides, at least, the following:  (a) the Purchased Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens and all Liabilities of any kind or nature whatsoever, whether at law or in equity, including without limitation, free and clear of any rights or claims based on theories of transferee or successor liability under any applicable Law, whether arising before or after the Petition Date, save and excepting only those Liabilities expressly assumed by Purchaser in writing under this Agreement, and provide that any such Liens attach to the net sale proceeds; (b) Purchaser has acted in "good faith" within the meaning of and is entitled to the protections of section 363(m) of the Bankruptcy Code and incorporate findings that Purchaser is a good faith purchaser within the meaning of 11 U.S.C. §363(m) and in accordance with the requirements set forth in Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 173 (3rd Cir. 1986); (c) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (d) no competing bids were received and/or that the Purchase Price is the highest and best offer for the Purchased Assets; (e) the Purchase Price represents fair value for the Purchased Assets and the sale is in the best interests of the bankruptcy estates; (f) that Purchaser is not an insider as that term is defined in 11 U.S.C. §101(30), and that adequate notice of the Sale Hearing was provided; and (g) this Agreement and the transactions contemplated hereby may, subject to the terms set forth herein, be specifically enforced against and binding upon, and not subject to rejection or avoidance by Seller, Debtor's estates or any other chapter 7 trustee of Debtor or other representative of their estates.

       1.2    Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|---|---|
| Agreement .......................................................................... | Preamble |
| Agreement Among Lenders | Recitals |
| Assumed Liabilities ............................................................ | 2.3 |
| Bankruptcy Case................................................................. | Recitals |
| Bankruptcy Code................................................................ | Recitals |
| Bankruptcy Court ............................................................... | Recitals |
| Business.............................................................................. | Recitals |
| Cash Purchase Price ........................................................... | 3.1 |

4

| Term | Section |
|------|---------|
| Closing................................................................. | 3.2 |
| Closing Date ....................................................... | 3.2 |
| Competing Transaction ....................................... | 8.2 |
| Contract Party.................................................... | 2.6(a) |
| Credit Bid Purchase Price................................... | 3.1 |
| Effective Date .................................................... | Preamble |
| Excluded Assets.................................................. | 2.2 |
| Excluded Liabilities............................................ | 2.4 |
| Necessary Consent.............................................. | 2.5 |
| Petition Date ...................................................... | Recitals |
| Purchase Price .................................................... | 3.1 |
| Purchased Assets ................................................ | 2.1 |
| Purchaser ............................................................ | Preamble |
| Seller................................................................... | Preamble |
| Transfer Taxes.................................................... | 10.1 |
| Trustee ............................................................... | Preamble |

ARTICLE II

**PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES**

2.1     Purchase and Sale of Assets.  On the terms and subject to the conditions precedent set forth in this Agreement, at the Closing the Trustee shall sell, assign, transfer, convey, and deliver to Purchaser, and Purchaser shall purchase and accept from the Trustee, free and clear of all Liens, all of Debtor's right, title, and interest in and to the assets as set forth on Schedule 1.01 hereto, as such exhibit may be amended from time to time, in writing, by mutual agreement of Purchaser and the Trustee prior to Closing (collectively, the "Purchased Assets"); provided, however, that the Trustee shall have no obligation to deliver any assets described in or set forth in Schedule 1.01 hereto which the Trustee, after good faith efforts, does not have in his possession or control as of the Closing Date; provided, further, however, that if the Trustee comes into possession or control of any assets described in Schedule l.01 hereto after the date of Closing, the Trustee shall reasonably promptly transfer such assets to Purchaser, at the expense of Purchaser. Notwithstanding the foregoing, Purchaser understands and acknowledges that (i) Debtor may continue to sell its inventory remaining as of the Closing Date and (ii) certain information contained, set forth or referenced in the Purchased Assets may be required by the Trustee for purposes of the administration of the Bankruptcy Case, and thus Purchaser shall make such information available to the Trustee and his professionals upon the request thereof.

2.2     Excluded Assets.  Notwithstanding any other provision of this Agreement, the Seller shall, at the Closing, retain, and Purchaser shall not acquire, any right, title or interest in any asset of Debtor that is not a Purchased Asset (collectively, the "Excluded Assets").

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, the following Liabilities

5

of Seller existing as of the Closing Date or the Assumption Date (collectively, the "Assumed Liabilities"):

(a)    All Liabilities of Seller under the Assumed Contracts and the other Purchased Assets that first arise on or after the Closing Date, as the case may be; and

(b)    Any Cure Costs that Purchaser is required to pay pursuant to Section 2.6(a).

2.4    Excluded Liabilities.  Notwithstanding anything to the contrary set forth herein, Purchaser will not assume and will be deemed not to have assumed, and Seller will remain liable with respect to, any and all Liabilities of Seller arising out of, relating to or otherwise in respect of the Business, or the Purchased Assets prior to the Closing Date, and all other Liabilities of Seller, at any time existing or asserted, whether or not accrued, fixed, contingent or otherwise, whether known or unknown, and whether or not recorded on the books and records of Seller or any of their Affiliates other than the Assumed Liabilities, (collectively, the "Excluded Liabilities"). Purchaser will not be obligated to assume, and does not assume, and hereby disclaims all of the Excluded Liabilities. For the avoidance of doubt, any Liabilities with respect to products sold, or actions or inactions, by Debtor before the Closing Date shall be deemed to be Liabilities that arise on or before the Closing Date regardless of when a claim is brought with respect to such products, actions or inactions.

2.5    Non-Assignment of Assets.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not affect the assignment or transfer of any Purchased Asset if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach, default or violation thereof or of any Law or Order, and (ii) the Bankruptcy Court has not entered an Order providing that such Necessary Consent is not required.  In such event, such assignment or transfer is subject to such Necessary Consent being obtained and Seller and Purchaser will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request.

2.6    Assumed Contracts.

(a)    Purchaser shall assume all obligations from and after the Closing Date under Assumed Contracts, and at such time as is required by the Bankruptcy Court in the Sale Order, shall pay the Cure Cost (or obtain waivers with respect thereto) in cash or other acceptable consideration to the third party (or parties) under the applicable Assumed Contract (each, a "Contract Party") and shall provide adequate assurance of future performance, pursuant to any Assumed Contract to which a Contract Party is a party (or obtain waivers with respect thereto).

(b)    No proposed assumption, assumption and assignment, or cure shall be binding on Purchaser until Purchaser has Closed the purchase and elected to assume the

6

applicable Assumed Contract.  Seller shall assume the Assumed Contracts (if any) within 10 days after the Closing Date and any contracts not assumed shall be Excluded Contracts.

2.7    <u>Further Conveyances and Assumptions</u>.  From time to time following the Closing, Seller and Purchaser will, and will cause Debtor to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated hereby; provided, that nothing in this <u>Section 2.7</u> will require Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.

ARTICLE III

**PURCHASE PRICE; CLOSING**

3.1    <u>Purchase Price</u>.  The aggregate consideration for the Purchased Assets, which shall be due and payable at Closing to Trustee, is as follows (the "<u>Purchase Price</u>"), exclusive of any Assumed Liabilities: (a) $5,500,000 to be paid by wire transfer of immediately available funds by Purchaser (the "<u>Cash Purchase Price</u>") and (b) $5,000,000 of the First Out Loan Obligations (as defined in the Agreement Among Lenders) by the First Out Lender, which amount of First Out Loan Obligations shall be subject to increase to up to $10,000,000 (or such higher amount as First Out Lender agrees in its sole discretion) in the event Trustee receives a bid for a Competing Transaction prior to or at the Sale Hearing pursuant to the terms set forth in <u>Section 8.2</u> (the "<u>Credit Bid Purchase Price</u>").  First Out Lender hereby designates Purchaser to be First Out Lender's designee to receive the Purchased Assets.

3.2    <u>Closing Date</u>.  The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> (the "<u>Closing</u>") will take place on the date that is no later than two Business Days after the satisfaction or waiver of the conditions set forth in <u>Sections 4.1</u>, <u>4.2</u>, <u>4.3</u> and <u>4.4</u>, provided any otherwise applicable stay under Fed. R. Bankr. P. 6004(h) is waived and not in effect and there is no other stay of the Sale Order in effect.  The date on which the Closing is held is referred to in this Agreement as the "<u>Closing Date</u>." The transfer of the Purchased Assets and Assumed Liabilities will be deemed to take place and be effective on the Closing Date at 12:01 a.m. CST.

3.3    <u>Deliveries by Seller</u>.  At the Closing, Seller will deliver or cause to be delivered to Purchaser:

(a)    the Purchased Assets; provided that (i) delivery of all of the Purchased Assets at the Closing will be in a form that can be transferred to Purchaser (i.e., extracted data and not data in IT platforms that Purchaser cannot access or would have to pay money to access), and (ii) for any assets to be provided that are password protected, Purchaser will receive access to those passwords at Closing;

7

(b)     a counterpart of each of the Ancillary Agreements and all other assignments and other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser and Seller, as may be necessary, to convey and assign the Purchased Assets to Purchaser and vest title therein in Purchaser (in each case free and clear of all Liens), executed by Seller; and

(c)     such other documents as may be specified in this Agreement or any exhibit or schedule hereto.

3.4     <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will deliver to Seller:

(a)     The Cash Purchase Price;

(b)     a counterpart of each of the Ancillary Agreements to which Purchaser is a party, executed by Purchaser; and

(c)     such other documents as may be specified in this Agreement or any exhibit or schedule hereto.

3.5     <u>Deliveries by First Out Lender</u>.  At the Closing, First Out Lender will deliver to Seller:

(a)     The Credit Bid Purchase Price; and

(b)     such other documents as may be specified in this Agreement or any exhibit or schedule hereto.

ARTICLE IV

**CONDITIONS TO CLOSING**

4.1     <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     The representations and warranties of Seller set forth in <u>Section 5.4</u> and the representations and warranties of First Out Lender contained in this Agreement shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date.

(b)     Seller and First Out Lender shall have performed and complied with all covenants, obligations and agreements required in this Agreement to be performed or complied with by it prior to or on the Closing Date.

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 3.3</u>; provided that, for the avoidance of doubt, for purposes of

8

this condition to Closing, Seller's delivery of the Purchased Assets pursuant to <u>Section 3.3(a)</u> shall be as to all Purchased Assets notwithstanding the provisos set forth in <u>Section 2.1</u>.

(d)     First Out Lender shall have delivered, or caused to be delivered, all of the items set forth in <u>Section 3.5</u>.

(e)     There shall have not been any material damage, destruction, or other material adverse change in the Purchased Assets since the Petition Date, whether or not covered by insurance.

4.2     <u>Conditions Precedent to Obligations of Seller</u>.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)     The representations and warranties of Purchaser and First Out Lender contained in this Agreement shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date.

(b)     Purchaser and First Out Lender shall have performed and complied with all covenants, obligations and agreements required in this Agreement to be performed or complied with by Purchaser and First Out Lender, prior to or on the Closing Date.

(c)     Purchaser shall have delivered all of the items set forth in <u>Section 3.4</u>.

(d)     First Out Lender shall have delivered all of the items set forth in <u>Section 3.5</u>.

4.3     <u>Conditions Precedent to Obligations of First Out Lender</u>.  The obligations of First Out Lender to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by First Out Lender in whole or in part to the extent permitted by applicable Law):

(e)     The representations and warranties of Seller set forth in <u>Section 5.4</u> and the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date.

(f)     Purchaser and Seller shall have performed and complied with all covenants, obligations and agreements required in this Agreement to be performed or complied with by Purchaser and Seller, prior to or on the Closing Date.

(g)     Purchaser shall have delivered all of the items set forth in <u>Section 3.4</u>.

(h)     Seller shall have delivered all of the items set forth in <u>Section 3.3</u>.

4.4     <u>Conditions Precedent to Obligations of Purchaser, Seller and First Out Lender</u>.  The respective obligations Purchaser, Seller and First Out Lender to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser, Seller and First Out Lender in whole or in part to the extent permitted by applicable Law):

(a)     There shall not be in effect any Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby and no action shall have been taken nor any statute, rule or regulation shall have been enacted or promulgated, in each case, by any Governmental Body that prohibits the consummation of the transactions contemplated hereby.

(b)     The Bankruptcy Court shall have entered the Sale Order (it being understood that the form of order shall be satisfactory to Seller, Purchaser and First Out Lender, in their reasonable discretion, and shall satisfy prong (iv) in the definition of Sale Order) and the Sale Order shall be in full force and effect and not stayed and shall not have been reversed or modified since the date of entry.

4.5     <u>Frustration of Closing Conditions</u>.  No party may rely on the failure of any condition set forth in <u>Sections 4.1</u>, <u>4.2</u>, <u>4.3</u>, or 4.4 as the case may be, if such failure was caused by such party's failure to comply with or breach of any provision of this Agreement.

ARTICLE V

**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller represents and warrants to Purchaser and First Out Lender as of the date of this Agreement and as of the Closing as follows:

5.1     <u>Organization and Good Standing</u>.  Each Debtor is a limited liability company or corporation, as applicable, duly organized and existing under the laws of its applicable state of formation or organization.

5.2     <u>Authorization of Agreement</u>.  Subject to entry of an order by the Bankruptcy Court approving this Agreement, Seller has all requisite power and authority to enter into this Agreement and any other agreements, instruments of transfer, and other documents required to be executed and delivered pursuant to this Agreement, to which Seller is a party and to consummate the transactions contemplated hereby and thereby. This Agreement has been duly executed and delivered by Seller. Upon entry of a Sale Order by the Bankruptcy Court approving this Agreement, this Agreement shall constitute a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

10

5.3    No Conflict.  The execution, delivery, and performance by Seller of this Agreement does not and will not (a) conflict with or violate any Law or Governmental Body applicable to it or any of its assets, or (b) violate, result in any breach of, constitute a default (or event which with the giving of notice of lapse of time, or both, would become a default) under, require any consent that has not been obtained under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any contract or agreement to which Debtor is a party or (c) result in the creation of any Lien on the Purchased Assets.

5.4    Ownership of the Purchased Assets.  Based on his review of the Debtor's schedules of assets and liabilities and other limited information provided to him, Seller represents and warrants that to the best of his understanding and knowledge all of the Purchased Assets are owned by Debtor.

5.5    Title and Condition.  On the date of Closing and by virtue of entry of the Sale Order, Purchaser will acquire the Purchased Assets free and clear of all Liens. The Purchased Assets are being sold on an **"AS IS, WHERE IS" BASIS, WITH ANY AND ALL FAULTS**.

5.6    Disclosure.  No representation or warranty or other statement made by Seller in connection with the transactions hereunder contains any untrue statement or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading.  There does not now exist any event, condition, or other matter, or any series of events, conditions, or other matters, individually or in the aggregate, adversely affecting the Seller's assets, the Business, prospects, financial condition, or results of its operations that has not been specifically disclosed to Purchaser in writing by Seller on or prior to the date of this Agreement.

## ARTICLE VI

### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller and First Out Lender as of the date of this Agreement and as of the Closing:

6.1    Organization and Good Standing.  Purchaser is a limited liability company duly organized, existing, and in good standing under the laws of the State of Delaware.

6.2    Authorization of Agreement.  Purchaser has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution, delivery, and performance of Purchaser's obligations under this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Purchaser. This Agreement has been duly executed and delivered by Purchaser. This Agreement constitutes a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

11

6.3    <u>No Conflict</u>The execution, delivery, and performance of this Agreement by Purchaser does not and will not violate, conflict with, or result in the breach of Purchaser's limited liability company operating agreement, or conflict with or violate any Law or order of any Governmental Body applicable to Purchaser.

6.4    <u>Sufficient Funds</u>Purchaser has, on the date hereof and as of the Closing Date, the financial capability to pay the Cash Purchase Price to purchase the Purchased Assets on the terms and subject to the conditions set forth in this Agreement.

6.5    <u>Litigation</u>.  As of the date hereof, there are no Legal Proceedings pending or, to the actual knowledge of Purchaser, threatened against Purchaser that involve or relate to any of the transactions contemplated by this Agreement.

ARTICLE VII

**REPRESENTATIONS AND WARRANTIES OF FIRST OUT LENDER**

First Out Lender hereby represents and warrants to Seller and Purchaser as of the date of this Agreement and as of the Closing:

7.1    <u>Organization and Good Standing</u>.  First Out Lender is a limited liability company duly organized, existing, and in good standing under the laws of the State of Delaware.

7.2    <u>Authorization of Agreement</u>.  First Out Lender has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution, delivery, and performance of First Out Lender's obligations under this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of First Out Lender. This Agreement has been duly executed and delivered by First Out Lender. This Agreement constitutes a valid and binding obligation of First Out Lender, enforceable against First Out Lender in accordance with its terms.

7.3    <u>No Conflict</u>The execution, delivery, and performance of this Agreement by First Out Lender does not and will not violate, conflict with, or result in the breach of First Out Lender's limited liability company operating agreement, or conflict with or violate any Law or order of any Governmental Body applicable to First Out Lender.

7.4    <u>First Out Obligations</u>First Out Lender has, on the date hereof and as of the Closing Date, sufficient First Out Obligations owed to it to pay the Credit Bid Purchase Price to purchase the Purchased Assets (with Purchaser being its designee to receive the Purchased Assets) on the terms and subject to the conditions set forth in this Agreement.

12

      7.5    <u>Litigation</u>.  As of the date hereof, there are no Legal Proceedings pending or, to the actual knowledge of First Out Lender, threatened against First Out Lender that involve or relate to any of the transactions contemplated by this Agreement.

      7.6    <u>Agreement Among Lenders</u>. First Out Lender constitutes the "Required First Out Lenders" under the Agreement Among Lenders that provides, among other things, that the Agreement Among Lenders is "without prejudice to the right of any First Out Lender to 'credit bid' the First Out Obligations owed to it pursuant to Section 363(k) of the Bankruptcy Code."

ARTICLE VIII

<b>BANKRUPTCY COURT MATTERS</b>

      8.1    <u>Bankruptcy Matters</u>. This Agreement is subject to, and conditioned upon, approval of the Bankruptcy Court. Subject only to Seller's duties and obligations under the Bankruptcy Code to accept the highest and best offer for the Purchased Assets, Seller agrees to use his best efforts to obtain Bankruptcy Court approval and any other approvals and orders necessary for the consummation of the transactions contemplated hereby. Trustee further agrees to use its best efforts to obtain from the Bankruptcy Court a waiver of the fourteen-day stay period under Fed.R. Bankr. P. 6004(h).

      8.2    <u>Sale Procedures</u>.  Although the proposed sale of the Purchased Assets shall be submitted by Seller to the Bankruptcy Court as a private sale, Purchaser acknowledges and agrees that Seller, as a trustee subject to the oversight and under the jurisdiction of the Bankruptcy Court, may be required to accept a higher and better bid for the Purchased Assets, and that an auction may be required to obtain higher or better bids for the Purchased Assets. If, prior to a Sale Hearing, Seller receives a higher and better offer for all or certain of the Purchased Assets (a "<u>Competing Transaction</u>"), as Seller may determine in his sole discretion, Purchaser understands and agrees that Seller may convene an auction or some other process to obtain the highest and best bid for the Purchased Assets, provided that in no event shall Seller accept a higher and better offer for the Purchased Assets without affording Purchaser the right to submit a topping bid(s) at an auction or otherwise; provided further that, Seller shall bifurcate the sale hearing to first seek approval of bid procedures and second, after conducting an auction, seek approval of the winning bidder. In the event of a Competing Transaction, First Out Lender shall increase the Purchase Price by increasing the amount of First Out Loan Obligations that constitute Purchase Price such that the Purchase Price will not be less than the amount of such third-party bid plus one dollar ($1.00); provided that in no event will First Out Lender be required to bid more than ten million dollars ($10,000,000).

ARTICLE IX

<b>COVENANTS</b>

      9.1    <u>Access to Information</u>.  From the date hereof through the Closing Date, Purchaser will be entitled, through its officers, employees, consultants and Representatives (including, without limitation, its legal advisors and accountants), in each case consistent with and subject to the processes and limitations prior to execution of this Agreement, to make such

investigation of the businesses and operations of the Business, and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests for any reasonable purpose (for the avoidance of doubt, this does not replace the delivery of the Purchased Assets under Section 3.3(a) and Purchaser shall not bear the cost of such delivery). Any such investigation and examination will be conducted during normal business hours upon reasonable advance notice and under reasonable circumstances and will be subject to restrictions under applicable Law. Seller will direct and use reasonable best efforts to cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to promptly cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination. No investigation by Purchaser prior to or after the date of this Agreement will affect or be deemed to modify any of the representations, warranties, covenants or agreements of Seller contained in this Agreement.

9.2    Actions Pending the Closing. Except (i) as required by applicable Law or by order of the Bankruptcy Court, (ii) as otherwise expressly contemplated by this Agreement, or (iii) with the prior written consent of Purchaser, during the period from the date of this Agreement to and through the Closing Date: (1) Seller will maintain the Purchased Assets in their current condition, ordinary wear and tear excepted and comply with applicable Laws in all material respects; and (2) Seller will not:

(a)    subject any of the Purchased Assets to any Lien (other than Lien(s) that may already exist);

(b)    enter into any Contract for the direct or indirect sale (whether by merger, sale of assets or stock, or otherwise), transfer, financing, assignment, conveyance, lease, recapitalization or other disposition of any Purchased Asset;

(c)    permit the lapse of any right relating to the purchased intellectual property listed on Schedule 1.01, including trademark and domain name registrations that could have been averted through the commercially reasonable efforts of Seller; provided that the Trustee shall have no obligation to investigate such and shall have no obligation to expend any funds in connection with such;

(d)    enter into any material Contract or renew, extend, expand or otherwise amend the terms of any existing Contract;

(e)    merge or consolidate Debtor with any other Person or acquire any business or equity interests or any other Person;

(f)    take, or agree, commit or offer (in writing or otherwise) to take, any actions in violation of the foregoing prohibited by this Section 9.2(a).

9.3    Consents. Seller will use commercially reasonable efforts, and Purchaser will cooperate with Seller, to obtain at the earliest practicable date all consents and approvals contemplated by this Agreement, including the Necessary Consents.

9.4    Further Assurances. Subject to the other provisions of this Agreement, each of Purchaser, Seller and First Out Lender will use its commercially reasonable efforts to (i) take

14

all actions necessary or appropriate to consummate the transactions contemplated by this Agreement, (ii) provide the other parties with reasonable cooperation and take such actions as such other parties may be reasonably request in connection with the consummation of the transactions contemplated by this Agreement, (iii) following the Closing, execute and deliver such additional documents, instruments, assignments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and (iv) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

9.5     <u>Notification of Certain Matters</u>.   From time to time prior to the Closing, Seller shall promptly deliver written notice to the Purchaser and First Out Lender of (i) any event, change, effect, condition, state of facts, or occurrence that comes to the Seller's knowledge that (A) would reasonably be expected to (x) cause a breach of the Seller's covenants under this Agreement, (y) render the satisfaction of the conditions in <u>Section 4.1</u>, <u>Section 4.3</u> or <u>Section 4.4</u> reasonably unlikely to be fulfilled, or (z) prevent, prohibit or delay the Closing, (B) that, if occurring or arising or in existence before or on the date of this Agreement would have caused a representation or warranty of the Seller to be inaccurate or deficient in any material respects; (ii) any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the transactions contemplated by this Agreement; and (iii) the commencement of any Legal Proceedings relating to the Business or the Purchased Assets.  The delivery of any notice pursuant to this <u>Section 9.5</u> will not have any effect on the satisfaction of the condition to closing set forth in <u>Section 4.1(a)</u> or the Purchaser's, Seller's or First Out Lender's right to terminate the Agreement pursuant to <u>Section 11.1</u>.

9.6     <u>Use of Name</u>.  Following the Closing, and except as otherwise utilized in connection with the Bankruptcy Cases, Seller shall cause Debtor to promptly discontinue use of the "Jenny" or "Jenny Craig" name and all other trademarks included in the Purchased Assets (subject to the rights of Debtor to continue to sell its inventory remaining as of the Closing Date). Within ten Business Days following the Closing, Seller shall seek relief in the Bankruptcy Court to authorize the name change of Debtor and to change the case caption to reflect such name change such that the legal name of Debtor will be changed to remove "Jenny" or "Jenny Craig" from its name.

9.7     <u>Employee Matters</u>. Purchaser will not be responsible as a successor employer for any obligations of Seller or Debtor.  Purchaser will not have any obligation to employ or to consider employing any Employee on or after the Closing. Purchaser shall have no obligation to assume any employee benefit plan. Except as otherwise specifically set forth herein, if any Employees are hired by Purchaser, Purchaser shall have the right to establish the initial terms and conditions of employment for such Employees and will not be obligated to provide any particular level of compensation or benefits to such Employees except as Purchaser may otherwise agree.

ARTICLE X

**TAXES**

10.1    <u>Transfer Taxes</u>.    All documentary, stamp, transfer, motor vehicle registration, sales, use, excise and other similar non-income taxes and all filing and recording fees (and any penalties and interest associated with such taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement (collectively, "<u>Transfer Taxes</u>") will be borne by Purchaser, regardless of the party on whom liability is imposed under the provisions of the Laws relating to such Transfer Taxes.  The Purchaser will provide timely proof of payment, and to the extent Purchaser objects to the taxes Purchaser shall be responsible for all costs and/or penalties relating to such objection(s).

10.2    <u>Purchase Price Allocation</u>. Purchaser and Seller shall allocate the Purchase Price (together with Assumed Liabilities properly included, if any) among the Purchased Assets in a manner consistent with the fair market values determined in good faith and on a reasonable basis by Purchaser and Seller within 60 days after the Closing Date. Such allocation shall be consistent with Section 1060 of the Internal Revenue Code and the Treasury Regulations thereunder, as applicable.  Purchaser shall supply a draft of Form 8594 (or other applicable draft allocation schedule) for approval by Seller, which approval shall not be unreasonably withheld, conditioned, or delayed, within 90 days after Closing, and Seller shall notify Purchaser within 30 days thereof if Seller objects to the allocations.

10.3    <u>Cooperation and Audits</u>.  Purchaser and Seller will cooperate fully with each other regarding tax matters (including the execution of appropriate powers of attorney) and will make available to the other as reasonably requested all information, records and documents relating to taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such taxes without fee or charge.

ARTICLE XI

**TERMINATION**

11.1    <u>Termination of Agreement</u>.  This Agreement may be terminated prior to the Closing as follows:

(a)    by Purchaser, Seller or First Out Lender, upon prior written notice to the other parties, if the Closing has not occurred by 5:00 PM eastern time on June 30, 2023 and the party seeking to terminate this Agreement is not in breach thereof;

(b)    by mutual written consent of Seller, Purchaser and First Out Lender;

(c)    the consummation of a Competing Transaction of the Purchased Assets; or

(d)    by any party to this Agreement, in the event of a material breach or misrepresentation under this Agreement by any other party that is not cured within five calendar

16

days after written notice thereof is given by the party alleging such material breach or misrepresentation (subject to extension in the event such breach cannot reasonably be cured within such period) and the party seeking to terminate this Agreement is not in breach thereof; provided, however, that no cure period shall apply to Purchaser's and First Out Lender's obligations to deliver the Cash Purchase Price and Credit Bid Purchase Price (as increased, if applicable), respectively, to Seller at Closing.

        11.2    <u>Procedure Upon Termination</u>.  If this Agreement is terminated pursuant to <u>Section 11.1</u> hereof, written notice thereof will forthwith be given to the other party or parties, and this Agreement will terminate as described below, and the purchase of the Purchased Assets and assumption of the Assumed Liabilities hereunder will be abandoned, without further action by Purchaser or Seller.

        11.3    <u>Effect of Termination</u>.  If this Agreement is terminated as provided herein (other than pursuant to the following sentence), then each of the parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and there shall be no liability or obligation on Purchaser, First Out Lender, Seller, or any of their respective Representatives; <u>provided</u>, <u>however</u>, that the provisions of this <u>Section 11.3</u>, <u>Section 8.2</u>, and Article XII (other than <u>Section 12.3</u>) and, to the extent necessary to effectuate the foregoing enumerated provisions, <u>Section 1.1</u>, will survive any such termination and will be enforceable hereunder; <u>provided</u>, <u>further</u>, that nothing in this <u>Section 11.3</u> will be deemed to release any party from liability for any fraudulent or criminal acts, the remedies for which shall not be limited by the provisions of this Agreement. Notwithstanding the preceding sentence, in the event this Agreement is terminated as a result of <u>Section 11.1(c)</u>, (a) Seller shall pay (i) $450,000 to Purchaser from the proceeds of such Competing Transaction and (ii) the reasonable fees, costs and expenses (including, without limitation, attorneys' fees) incurred by First Out Lender in connection with the transactions contemplated by this Agreement through the date of the termination and (b) First Out Lender shall pay $550,000 to Purchaser promptly upon First Out Lender's receipt of proceeds from such Competing Transaction.

ARTICLE XII

**MISCELLANEOUS**

        12.1    <u>No Survival of Representations and Warranties</u>.  The representations and warranties contained in this Agreement will not survive the Closing, and none of the parties will have any liability to each other after the Closing for any breach thereof.  The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing hereunder until the expiration of the applicable statute of limitations or for such shorter period explicitly specified therein, and each party hereto will be liable to the other after the Closing for any breach thereof.

        12.2    <u>Expenses</u>.  Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated hereby are consummated, Seller, Purchaser and First Out Lender will bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby and all

17

proceedings incident thereto; provided, however, the Trustee shall pay the fees and expenses incurred by Purchaser in connection with the preparation of the motion filed by the Trustee of Debtor in an amount not to exceed $6,000, which amount shall be credited against the Cash Purchase Price to the extent the Closing occurs.  This Section 12.2 shall not apply with respect to any expenses incurred by the parties in connection with any action for a breach of this Agreement or any other agreement, document and instrument contemplated by this Agreement.

12.3    Injunctive Relief.

(a)    The parties agree that irreparable damages would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto will be entitled to seek injunctive relief to prevent any such breach, and to seek to specifically enforce the terms and provisions of this Agreement, including without limitation to seek specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this Section 12.3 will be in addition to any other rights which a party hereto may have at law or in equity pursuant to this Agreement.

(b)    The parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by the Purchaser, First Out Lender or the Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of the Purchaser, First Out Lender or the Seller, as applicable, under this Agreement all in accordance with the terms of this Section 12.3.

12.4    Submission to Jurisdiction; Consent to Service of Process.  Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 12.8 hereof; provided, however, that if the Bankruptcy Cases have been closed pursuant to Section 350 of the Bankruptcy Code, and the Bankruptcy Court refuses to reopen the Bankruptcy Case, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware sitting in Wilmington, Delaware for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute

18

brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.8; provided, however, that such service will not be effective until the actual receipt thereof by the party being served.

12.5    Waiver of Right to Trial by Jury.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

12.6    Entire Agreement; Amendments and Waivers.  This Agreement (including the exhibits and schedules attached hereto) represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof; provided, however, solely as to Purchaser and First Out Lender, that certain Term Sheet, executed on May 23, 2023, by and among Purchaser, First Out Lender and Trustee shall survive.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, will be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

12.7    Governing Law.  This Agreement shall be governed by and construed in accordance with the Bankruptcy Code, applicable Bankruptcy Rules and the internal, substantive laws of the State of Delaware without regard to any state's choice or conflicts of laws provisions.

12.8    Notices.  All notices and other communications under this Agreement will be in writing and will be deemed given (i) when delivered personally by hand, (ii) when sent by facsimile or email transmission (so long as confirmation of transmission is electronically or mechanically generated and kept on file by the sending party) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case to the respective Persons at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:

19

Don A. Beskrone, Chapter 7 Trustee
P.O. Box 272
Wilmington, DE 19899
Phone: (302) 654-1888
Email: dbeskronetrustee@gmail.com

with a copy to counsel for Seller:

Ashby & Geddes, P.A.
500 Delaware Ave., 8th Floor
Wilmington, DE 19801
Attention: Ricardo Palacio
Email: rpalacio@ashbygeddes.com

If to Purchaser, to:

JCR Holdings II, LLC
c/o Winston & Strawn LLP
2121 N. Pearl Street, Suite 900
Dallas, Texas 75201
Attention: Christina Tate; Dan McGuire
Email: ctate@winston.com; dmcguire@winston.com

With a copy to counsel for Purchaser:

Winston & Strawn LLP
2121 N. Pearl Street, Suite 900
Dallas, Texas 75201
Attention: Christina Tate and Dan McGuire
Email: ctate@winston.com; dmcguire@winston.com

If to First Out Lender, to:

First Out Lender Private Credit SPV, LLC
383 Main AvenueNorwalk, CT 06851
Attention: John Ryan
Email: jryan@encinacapital.com

With a copy to counsel for First Out Lender:

Paul Hastings LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
Attention: Justin Rawlins
Email: justinrawlins@paulhastings.com

20

12.9    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.10    <u>Assignment</u>.  This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, and nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder may be made by Seller, Purchaser or First Out Lender (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents will be void, <u>provided</u>, <u>however</u>, that Purchaser and First Out Lender may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more of their respective Affiliates.  No assignment of any obligations hereunder will relieve the parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Seller, Purchaser and First Out Lender will also apply to any such assignee unless the context otherwise requires.

12.11    <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, and by the different parties in separate counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means (including portable document format) shall be as effective as delivery of a manually executed counterpart of this Agreement.

12.12    <u>No Presumption</u>.  The parties to this Agreement agree that this Agreement was negotiated fairly between them at arms' length and that the final terms of this Agreement are the product of the parties' negotiations.  Each party represents and warrants that it has sought and received legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby.  The parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a party or parties on the grounds that the party or parties drafted or was more responsible for drafting the provisions. References herein to "including" mean "including, without limitation."

*Signature pages follow*

21

Executed as of the date first stated above.

> **JENNY C ACQUISITION, INC.**
> **JC USA, INC.**
> **JC FRANCHISING, INC.**
> **CRAIG HOLDINGS, INC.**
> **JENNY C INTERMEDIATE HOLDINGS, INC.**
> **JENNY C HOLDINGS, LLC**
>
> By: _____
> Don A. Beskrone
> solely as Chapter 7 Trustee
>
>
> **JCR HOLDINGS II, LLC**
>
> By: _____
> Name: David Gassko
> Title: Vice President
>
>
> **ENCINA PRIVATE CREDIT SPV, LLC**
>
> By: _____
> Name:
> Title:

*Signature Page to Asset Purchase Agreement*

Executed as of the date first stated above.

> JENNY C ACQUISITION, INC.
> JC USA, INC.
> JC FRANCHISING, INC.
> CRAIG HOLDINGS, INC.
> JENNY C INTERMEDIATE HOLDINGS, INC.
> JENNY C HOLDINGS, LLC

By: _____
    Don A. Beskrone
    solely as Chapter 7 Trustee

> JCR HOLDINGS II, LLC

By: _____
Name: _____
Title: _____

> ENCINA PRIVATE CREDIT SPV, LLC

By: _____
Name: ___F John J. Ryan_____
Title: ___Duly Authorized Signatory___

## <u>SCHEDULE 1.01</u>

<u>Purchased Assets</u>

To the extent owned or purported to be owned by Debtor:

<u>Intellectual Property Related Assets</u>

- *Trademarks*: all statutory and common law rights in and to trademarks and service marks (both registered and unregistered), trademark and service mark registrations, trademark and service mark applications, trade dress, logos, slogans, tag lines, trade names, fictitious names and the goodwill associated therewith and rights to any consent to use or register, co-existence or similar related to the foregoing. This shall include the trademark registrations and applications set forth on Appendix A.
- *Domain Names*: internet domain names (including a list of all domain names and all domain registrars), social media accounts/channels (including Facebook and Instagram) and handles and all usernames, passwords and other access credentials therefor
- *Copyrights*: all designs, works of authorship, websites (including all website content and the Jenny Craig mobile app), copyrights, copyright registrations and copyright applications
- *Patents*: all patents and patent applications (including all reissues, divisions, continuations, continuations-in-part and extensions thereof)
- *Trade Secrets*: all trade secrets including, but not limited to, the product recipes and formulas, product specifications, manufacturing processes, research and development records, records of inventions, test information, market surveys and marketing know-how (including any marketing technology), employee lists and information, manufacturer/supplier and other vendor lists and information and other knowledge and know-how; also packaging plate molds/assets to the extent owned by Debtor
- *Software*: all proprietary code and software, including the Jenny Craig mobile app, in object code and source code form, and all related documentation and a list of any third party software incorporated in or necessary for operation of the proprietary software/code (for the avoidance of doubt, no third party property is being transferred, only a list of such third party property).
- *Intellectual Property Claims*: all claims, demands and rights of action that Debtor has for any past, present and future:
  - infringement, dilution or other violation of any of the transferred intellectual property,
  - misappropriation of, or breach of confidence with respect to, any of the transferred trade secrets,

  together with the right to prosecute such claims, demands and rights of action in Purchaser's own name, and the rights to collect and retain any damages therefor and to obtain equitable relief for all such infringement/misappropriation/other violation and to seek injunctive relief
- *Certain Related Documents*:
  - marketing materials including, but not limited to:

- sales and promotional literature (including marketing, advertising and other promotional materials)
- access to static assets (HTML, CSS, JS, Images) and other creative assets (Videos, PSDs, etc.) and logos
- scripts, photos, video footage, copy, etc. (including all food photography – product photography for the site and other marketing photography), and with respect to any licensed photos or other images, publicity rights and rights to related consents, waivers and permissions to use such images including in social media
- manuals for customer correspondence, call scripts and related documentation, including training materials for agents
- data on spending by ad and all data tracked on ad performance
- publicity rights and rights to related consents, waivers and permissions, including from the individual Jenny Craig and/or her husband Sidney Craig (deceased) relating to use of name, signature, image, likeness or other rights of privacy or publicity, including all transfers of such agreements to prior owners of the trademarks and to Debtor
- copies of all endorser and influencer contracts (for the avoidance of doubt, copies of these contracts only, not assignment and assumption of the contracts) and contact information (inclusive of celebrities and non-celebrities, i.e. individuals who lost weight on the plan and were used for B&As) and publicity rights and rights to related consents, waivers and permissions to use B&As
- copies of past and present privacy policies applicable to collection and use of personal information, including their effective date
- all marketing accounts and credentials thereto, including Debtor's Amazon central account, Google Analytics account and Facebook marketing account
  
  o list of vanity phone numbers such as 1-800-Jenny etc., carrier name, credential to the accounts to facilitate transfer of those phone numbers
  o documents (tangible or digital) regarding or embodying the transferred intellectual property and the transferred trade secrets including, but not limited to:
    - product catalog, PIM, meta data for products / SKUs
    - product recipes and active formulas and product specifications
    - product innovation or research and development records and files
    - consumer research
    - clinical studies and marketing claim analyses, including full protocols, raw data and final reports
    - all claim substantiation on programs (proven, most effective, support of 18 lbs claim, support of fat burning)
    - date of first use in commerce and date of first filing for registration information, registrations and applications, prosecution histories and correspondence with governmental intellectual property entities
    - litigation files relating to infringements and opposition or cancellation proceedings including, but not limited to, settlement agreements and cease and desist correspondence
  o SKU list and historical annual sales (Time Dimension – 3 years)

2

- o  Access to GS1 accounts for all products
- o  order related information – order header, order detail, coupons / promotions / campaigns, payment details, shipment details (Time Dimension – 3 Years)
- o  subscription related information – type of subscriptions, subscription term, pricing of subscriptions, early termination policy (Time Dimension – 3 Years)
- o  coaches related – list of coaches and their personal contact information (name, email, phone, address) (Time Dimension – Active Coaches)
- o  compensation, tenure and contact information for all employees, including prior performance results
- o  copies of all manufacturer/supplier and other vendor contracts (including all active coman and packaging agency contracts) (for the avoidance of doubt, copies of these contracts only, not assignment and assumption of the contracts) and contact information for all active manufacturers/suppliers/vendors
- o  login information, credentials and passwords to access all accounts (social media, vendor portals, Amazon, email marketing platform, SMS marketing platform, SaaS applications, etc.)
- o  contact information for all franchisees
- o  any and all files and records, whether stored on owned or shared (i.e. cloud) servers as well as all individual computers

Customer List Related Assets

- *Customer Lists*: customer lists and other potential customer distribution lists (Time Dimension – 5 Years) including all information in Debtor databases regarding each such customer, such as without limitation:
  - o  contact information (name, shipping address, billing address, phone numbers and email address)
  - o  biographical information, demographic data, internal or 3rd party, dietary restrictions, gender, age, weight, medical conditions (i.e. diab, chol, HBP)
  - o  purchasing histories, profile tracking (i.e. Start Date, Last Login, etc), reward program, weight loss tracking information
  - o  past and present subscription information
  - o  other PII (personally identifiable info)
- *Certain Customer Related Assets*: privacy related data requests such as Unsubscribe / Opt Out for both email and SMS, Do not call, Do not sell etc. (Time Dimension – 5 Years) and, to the extent assignable under non-bankruptcy law, assignment of such opt-in, opt-out and/or other consents such customers have provided Debtor regarding use of their personal information and/or various methods of contact

Possible Assumption of Certain Contracts

- As soon as possible but in any event prior to Closing, Purchaser will have the right to review the following categories of contracts. Following such review, Purchaser will have the right (with appropriate notice) to accept or reject the assumption of such contracts (for the avoidance of doubt, only those contracts the Purchaser so accepts shall constitute Assumed Contracts hereunder).
  - o  Contracts containing any consent to register, consent to use, co-existence or similar rights relating to any of the foregoing intellectual property related assets

3

- o  Contracts containing publicity rights or rights to related consents, waivers and permissions, in each case relating to use (including in social media) of names, signatures, images, likeness, B&As, scripts, photos, video footage, copy, etc. or other rights of privacy or publicity
- o  Material incoming licenses used by the Business

4

**Appendix A**

Trademark Registrations and Applications

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| Australia | RECHARGE BAR | 5 | 2203695 | 05-Apr-21 | | | Pending |
| Australia | MAX | 41 | 2309095 | 08-Jun-22 | | | Pending |
| Australia | MAX UP | 41 | 2308891 | 08-Jun-22 | | | Pending |
| Australia | JENNY CRAIG | 05, 29, 30, 44 | 1257045 | 14-Aug-08 | 1257045 | 14-Dec-09 | Registered |
| Australia | jenny CRAIG | 16, 29, 30, 44 | 1719042 | 03-Sep-15 | 1719042 | 05-Apr-16 | Registered |
| Australia | Jenny Craig | 16 | 639397 | 31-Aug-94 | 639397 | 12-Jul-96 | Registered |

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| Australia | *Jenny Craig* | 30 | 639398 | 31-Aug-94 | 639398 | 12-Jul-96 | Registered |
| Australia | JEN4MEN | 05, 29, 30, 41, 42, 44 | 1272567 | 17-Nov-08 | 1272567 | 29-Jun-09 | Registered |
| Australia | JENNY'S BISTRO | 29, 30 | 1508707 | 16-Aug-12 | 1508707 | 15-May-13 | Registered |
| Australia | JENNY'S CUISINE | 29 | 427469 | 27-May-85 | 427469 | 22-Jul-88 | Registered |
| Australia | JENNY'S CUISINE | 5 | 466086 | 27-May-85 | 466086 | 27-Jul-90 | Registered |
| Australia | JENNY'S CUISINE | 30 | 466087 | 27-May-85 | 466087 | 27-Jul-90 | Registered |
| Australia | SKILLPOWER | 05, 29, 30, 41, 42, 44 | 1272565 | 17-Nov-08 | 1272565 | 10-Jul-09 | Registered |
| Australia | RAPID RESULTS | 16, 44 | 1905212 | 07-Feb-18 | 1905212 | 27-Sep-18 | Registered |

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| Australia | JENNY CRAIG WORKS | 16, 29, 30, 44 | 2217242 | 07-Oct-21 | 2217242 | 16-May-22 | Registered |
| Brazil | JENNY CRAIG | 30 | 823642070 | 13-Mar-01 | 823642070 | 04-Mar-08 | Registered |
| Brazil | JENNY CRAIG | 42 | 823642062 | 13-Mar-01 | 823642062 | 13-Mar-07 | Registered |
| Brazil | JENNY CRAIG | 42 | 816895171 | 25-Sep-92 | 816895171 | 07-Jun-94 | Registered |
| Canada | jenny RECHARGE BAR | 5 | 2128009 | 05-Apr-21 | | | Pending |
| Canada | RAPID RESULTS MAX | 5, 16,31, 44 | 2107161 | 14-May-21 | | | Pending |
| Canada | MAX | 41 | 2216775 | 08-Jun-22 | | | Pending |

3

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| Canada | MAX UP | 41 | 2216777 | 08-Jun-22 | | | Pending |
| Canada | JENNY CRAIG | | 1093524 | 21-Feb-01 | TMA575432 | 12-Feb-03 | Registered |
| Canada | RAPID 16 | 44 | 1900366 | 22-May-18 | TMA1097941 | 12-Apr-21 | Registered |
| Canada |  | 16, 30 | 0763052 | 31-Aug-94 | TMA470592 | 05-Feb-97 | Registered |
| Canada |  | 16, 30 | 0763051 | 31-Aug-94 | TMA471547 | 25-Feb-97 | Registered |
| Canada |  | 30, 42 | 0680041 | 17-Apr-91 | TMA403999 | 23-Oct-92 | Registered |
| Canada | SOUPITIZERS | 29 | 1494983 | 07-Sep-10 | TMA811626 | 10-Nov-11 | Registered |

4

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| Canada | RAPID RESULTS | 29, 30 | 1877605 | 15-Jan-18 | TMA1117138 | 06-Jan-22 | Registered |
| China | JENNY CRAIG | 29 | 21855080 | 10-Nov-16 | 21855080 | 07-Feb-18 | Registered |
| China | JENNY CRAIG | 41 | 21776860 | 03-Nov-16 | 21776860 | 07-Feb-18 | Registered |
| China | JENNY CRAIG | 44 | 21776862 | 03-Nov-16 | 21776862 | 07-Feb-18 | Registered |
| China | JENNY CRAIG | 44 | 4547886 | 18-Mar-05 | 4547886 | 07-Oct-08 | Registered |
| China | jenny CRAIG | 29 | 21869265 | 10-Nov-16 | 21869265 | 07-Feb-18 | Registered |
| China | jenny CRAIG | 44 | 21776861 | 03-Nov-16 | 21776861 | 07-Feb-18 | Registered |

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| Europe | JENNY CRAIG | 30, 42 | 002105500 | 26-Feb-01 | 002105500 | 24-Apr-03 | Registered |
| Europe | *Jenny Craig* | 29, 30, 41, 42, 44 | 008246563 | 27-Apr-09 | 008246563 | 14-Nov-09 | Registered |
| France | JENNY CRAIG | 43 | 3850101 | 31-Jul-11 | 3850101 | 18-Nov-11 | Registered |
| Hong Kong | JENNY CRAIG | 30 | 200209440 | 12-Jan-01 | 200209440 | 24-Jul-02 | Registered |
| Hong Kong | JENNY CRAIG | 42 | 200205686 | 12-Jan-01 | 200205686 | 14-May-02 | Registered |
| India | *Jenny Craig* | 16 | 663604 | 25-Apr-95 | 663604 | 25-Apr-95 | Registered |
| India | *Jenny Craig* | 30 | 663605 | 25-Apr-95 | 663605 | 25-Apr-95 | Registered |
| International | RAPID RESULTS MAX | 5, 16,31, 44 | 1178769 | 14-May-21 | 1178769 | 15-Nov-21 | Registered |

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| International | MAX | 41 | 1690474 | 08-Jun-22 | 1690474 | 08-Jun-22 | Registered |
| International | MAX UP | 41 | 1690024 | 08-Jun-22 | 1690024 | 08-Jun-22 | Registered |
| Iran (Islamic Republic of) | Jenny Craig | 16, 30, 42 | 7601269 | 13-Apr-97 | 81844 | 03-Nov-97 | Registered<br><br>Cannot locate mark |
| Israel | Jenny Craig | 16 | 98043 | 11-Apr-95 | 98043 | 04-Jan-97 | Registered |
| Israel | Jenny Craig | 30 | 98044 | 11-Apr-95 | 98044 | 05-Jan-97 | Registered |
| Israel | Jenny Craig | 42 | 98045 | 11-Apr-95 | 98045 | 05-Jan-97 | Registered |
| Japan | JENNY CRAIG | 30, 42 | 2001014793 | 21-Feb-01 | 0004566107 | 10-May-02 | Registered |
| Korea, Republic of | JENNY CRAIG | 42 | 4520010000697 | 23-Feb-01 | 4500088890000 | 16-Dec-03 | Registered |

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| Lebanon |  | 16, 30, 44 | 733366086 | 16-Feb-10 | 126697 | 07-Jun-95 | Registered |
| New Zealand | MAX | 41 | 1222139 | 08-Jun-22 | | | Pending |
| New Zealand | MAX UP | 41 | 1222214 | 08-Jun-22 | | | Pending |
| New Zealand | JENNY CRAIG | 16 | 172188 | 15-May-87 | 172188 | 21-Dec-90 | Registered |
| New Zealand | JENNY CRAIG | 05, 29, 30, 44 | 794384 | 14-Aug-08 | 794384 | 08-Apr-10 | Registered |
| New Zealand |  | 16, 29, 30, 44 | 1026916 | 03-Sep-15 | 1026916 | 04-Mar-16 | Registered |
| New Zealand | RAPID 16 | 44 | 1093541 | 23-May-18 | 1093541 | 27-Nov-18 | Registered |
| New Zealand |  | 16 | 240508 | 31-Aug-94 | 240508 | 31-Aug-94 | Registered |

8

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| New Zealand |  | 30 | 240509 | 31-Aug-94 | 240509 | 31-Aug-94 | Registered |
| New Zealand |  | 16 | 240510 | 31-Aug-94 | 240510 | 24-Jan-97 | Registered |
| New Zealand |  | 30 | 240511 | 31-Aug-94 | 240511 | 24-Jan-97 | Registered |
| New Zealand | JEN4MEN | 05, 29, 30, 41, 42, 44 | 799013 | 14-Nov-08 | 799013 | 11-Jun-09 | Registered |
| New Zealand | JENNY'S CUISINE | 29 | 158845 | 04-Jun-85 | 158845 | 27-Jun-95 | Registered |
| New Zealand | JENNY'S CUISINE | | 162177 | 20-Nov-85 | 162177 | 27-Feb-96 | Registered |
| New Zealand | SKILLPOWER | 05, 29, 30, 41, 42, 44 | 799011 | 14-Nov-08 | 799011 | 11-Jun-09 | Registered |

9

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| New Zealand |  | 16, 29, 30, 44 | 1084717 | 12-Jan-18 | 1084717 | 13-Jul-18 | Registered |
| New Zealand |  | 5 | 1187200 | 05-Apr-21 | 1608208 | 01-Feb-22 | Registered |
| New Zealand | RAPID RESULTS MAX | 5, 16,31, 44 | 1178769 | 14-May-21 | 1178769 | 15-Nov-21 | Registered |
| New Zealand | JENNY CRAIG WORKS | 16, 29, 30, 44 | 1191687 | 07-Oct-21 | 2217242 | 16-May-22 | Registered |
| Pakistan |  | 16 | 130512 | 13-Jun-95 | 130512 | 13-Jun-95 | Registered |
| Pakistan |  | 30 | 130513 | 13-Jun-95 | 130513 | 13-Jun-95 | Registered |
| Panama | JENNY CRAIG | 45 | 22576101 | 26-Aug-13 | 22576101 | 26-Aug-13 | Registered |

10

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| Philippines | JENNY CRAIG and Design<br><br>JENNY CRAIG | 05, 29, 30, 32, 41, 42, 44 | 4-2012-503051 | November 22, 2012 | 4-2012-503051 | August 1, 2013 | Registered |
| Puerto Rico | *Jenny Craig* | 16 | 35314 | 13-Oct-44 | 35314 | 13-Oct-44 | Registered |
| Puerto Rico | *Jenny Craig* | 30 | 35315 | 13-Oct-44 | 35315 | 13-Oct-44 | Registered |
| Singapore | JENNY CRAIG | 30 | T0102058A | 20-Feb-01 | T0102058A | 12-Jan-01 | Registered |
| Singapore | JENNY CRAIG | 42 | T0102059Z | 20-Feb-01 | T0102059Z | 12-Jan-01 | Registered |
| South Africa | JENNY CRAIG | 30 | 200102914 | 12-Jan-01 | 200102914 | 23-Feb-06 | Registered |
| South Africa | JENNY CRAIG | 44 | 200102915 | 21-Feb-01 | 200102915 | 23-Feb-06 | Registered |
| Taiwan | JENNY CRAIG | 29 | 090037258 | 06-Sep-01 | 01024028 | 16-Nov-02 | Registered |

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| Tunisia | JENNY CRAIG | 30, 42 | 11319 | 16-Feb-01 | 11319 | 16-Feb-01 | Registered |
| United Arab Emirates | | 16 | 13820 | 15-Nov-95 | 8636 | 15-Nov-95 | Registered |
| United Arab Emirates | | 30 | 13821 | 15-Nov-95 | 8637 | 15-Nov-95 | Registered |
| United Arab Emirates | | 42 | 13822 | 15-Nov-95 | 8638 | 15-Nov-95 | Registered |
| United Kingdom | JENNY CRAIG | 30, 42 | 2105500 | 26-Feb-01 | 2105500 | 24-Apr-03 | Registered |
| United Kingdom | | 16, 30, 42 | 2115251 | 08-Nov-96 | 2115251 | 30-May-97 | Registered |
| United Kingdom | | 29, 30, 41, 42, 44 | 8246563 | 27-Apr-09 | 8246563 | 14-Nov-09 | Registered |
| United States of America | RECHARGE BY JENNY CRAIG | 5 | 90/138836 | 26-Aug-20 | | | Allowed |

12

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| United States of America | RECHARGE | 30 | 97/134992 | 19-Nov-21 | | | Allowed |
| United States of America | JENNY CRAIG RECHARGE | 30 | 97/134989 | 19-Nov-21 | | | Allowed |
| United States of America |  | 30 | 97/134998 | 19-Nov-21 | | | Allowed |
| United States of America | MAX | 44 | 97/165021 | 09-Dec-21 | | | Allowed |
| United States of America | MAX UP | 44 | 97/165024 | 09-Dec-21 | | | Allowed |
| United States of America | JENNY FRESH | 29, 30, 31, 39, 43 | 97/666782 | 07-Nov-22 | | | Pending |
| United States of America | | 29, 30, 31, 39, 43 | 97/666795 | 07-Nov-22 | | | Pending |

13

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| |  | | | | | | |
| United States of America |  | 44 | 87/726795 | 19-Dec-17 | | | Published |
| United States of America | RAPID RESULTS MAX | 9, 16 | 90/319944 | 15-Nov-20 | | | Published |
| United States of America | RAPID RESULTS MAX | 41 | 90/319946 | 15-Nov-20 | | | Published |
| United States of America | RAPID RESULTS MAX | 44 | 90/319947 | 15-Nov-20 | | | Published |
| United States of America | JENNY CRAIG | 05, 29, 30, 42 | 76/194252 | 12-Jan-01 | 2760695 | 09-Sep-03 | Registered |
| United States of America |  | 16, 43, 44 | 87/193781 | 05-Oct-16 | 5481840 | 29-May-18 | Registered |

14

| Jurisdiction | Mark | Class | Serial No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|---|---|
| United States of America |  | 16, 29, 30, 44 | 85/825677 | 17-Jan-13 | 4735712 | 12-May-15 | Registered |
| United States of America | RAPID 16 | 44 | 87/941726 | 30-May-18 | 5669253 | 05-Feb-19 | Registered |
| United States of America |  | 16, 29, 30 | 87/978439 | 19-Dec-17 | 6130839 | 18-Aug-20 | Registered |
| United States of America |  | 5 | 90/235506 | 05-Oct-20 | 6755237 | 07-Jun-22 | Registered |

15